which is Serrano-Estrada v. Garland, 21-1020. Council, we're ready for argument when you are. Good morning and may it please the Court. My name is Ben Flegel, pro bono counsel for Mr. Serrano-Estrada. Yes, and thank you for participating. Of course. I'd like to reserve about two minutes for rebuttal. You bet. Shortly before Mr. Serrano-Estrada sought protection in the United States, members of the Jalisco New Generation Cartel tortured him. Then, when he refused to assassinate a government official, the local boss told him, we're in charge of 17 states and we're going to take over the country. He said, authority is by our side and told him, if you come back here, you're going to get killed. Based on this threat and his knowledge that the cartel can use its government connections to execute on it, Mr. Serrano-Estrada fled to the United States. So what's the argument for error? Where do you contend that the B.I. erred? Well, there are two errors that are related. The first is that the I.J. did not recognize that the cartel boss's threat constitutes a likelihood of torture. The I.J. ignored evidence in the record showing that the Jalisco cartel members act with the acquiescence of state officials when they torture and execute their enemies, one of which is Mr. Estrada. The second is that the I.J. made an adverse credibility determination that lacked substantial evidence in the record and allowed this determination to improperly wash over Mr. Serrano-Estrada. So focus on the first one. Where do you, what specific evidence do you think that the I.J. did not consider but should have? Well, with respect, so the I.J. generally didn't consider the entire interaction with what is in the record described as El Chiquis in which Mr. Serrano-Estrada was hired by what was a childhood friend who he didn't know was involved with the cartel. And when he found out that the warehouse he was guarding was a cartel warehouse, they took him to the edge of town, tied him up, beat him up, and tortured him and would likely have killed him had his former friend not intervened and said, we will let you go if you agree to assassinate this government official. When he refused, he was told, if you return, we will kill you. That entire interaction wasn't discussed in connection with the cat claim and the likelihood of torture. Okay. It was discussed earlier, I think. It was discussed in the context of the adverse credibility determination. And what the I.J. did in this case is disregarded, or at least this was a factor in the adverse credibility determination solely because in prior accounts of this story, he did not disclose that he had built guns as part of the story. And what the law says is if you're going to use that to make an adverse credibility decision, you have to give him an opportunity to explain. That meaning an omission? Yes, an omission or an inconsistency in the testimony that you're going to use as a basis for an adverse credibility determination. You have to give the petitioner an opportunity to explain. Well, the BIA didn't really go on the adverse credibility angle, so I want to come back to your first assignment of error. Where was this raised in the brief to the BIA as an assignment of error? Well, in the brief to the BIA as an assignment of error, it focused, I think, a little bit too heavily on the concept of bias. And what I understand that argument to be in this case is an argument that the IJ looked at the testimony and through this adverse credibility determination basically said there's no evidence to support, to allow his testimony to be sufficient for a finding of a likelihood of torture. And I don't think that's right. The evidence in the record corroborates almost all. This case actually has a lot of evidence in the record that is not just testimonial evidence. And throughout, it corroborates his story where it exists. So, for example, there are witness statements from Mr. Serrano Estrada's trial that corroborate his story. They corroborate how he was removed from the bar. They corroborate that he was a police officer in civilian clothes drinking water. Could I interrupt? Forgive me. Yes. I think that's right. What I'm going to call the front end of this very long story, there's an unusual, in my experience, an unusual degree of corroboration. The story goes on and on, though. And your client was able to survive. And what they're talking about here, I think, is that he failed to show that there was a particularized risk, that if he returns, he would be tortured. And so that requires that we look at the entire sequence of events. Right. What's the best evidence that he showed a particularized risk of torture? Well, in this case, there are basically two main factors that show his particularized risk of torture. And the question, they're different in the question about whether when he returns, well, pardon me, whether he returns he goes back to prison or whether he returns he goes back to the streets. Right. So if he goes back to prison, I'm just trying to scoot along because I want to make sure you get to the questions that we have. If he goes back to prison, what the immigration courts, plural, basically said is when you were in prison, there was danger. And, in fact, your testimony is that the prison guards and prison officials actually did protect you by transferring you and actually facilitating his escape and so on and so forth. So are you taking issue with that? Yes. So the risk of his torture in prison is not the generalized risk that prison conditions are bad, that the IJ, that's what the IJ found. Right. No, it's that he was a former member of the military and a former member of the police. We've read it carefully. But if you can get to this, it's important at least in my notes and decision-making. That was true then, too, when he was in prison. He was at special risk because he had been a police officer. And what the IJ found is the prison officials protected you. But the risk is more specialized than that here because— If he goes back again, you mean? If he goes back again. Okay, why? Because the testimony is that the Barbosa family, who is still seeking revenge for the homicide years ago, can infiltrate the prisons and send hit men in there to kill him. Okay, but that was true before. In fact, they did, according to him. They did send somebody in to try to kill him. And the prison officials thwarted that effort. First instance, in the first time. There's another piece of evidence in the record, and I wonder if you could comment on it, about this continuing threat from the Barbosa family in particular. It's a declaration from this person's—the petitioner's former girlfriend and the mother of his child. And she says that they've threatened—the same family has threatened to harm their daughter, threatened to murder and rape her. Is that—you're familiar with that evidence? Yes. Did you raise that as part of the failure to consider the particularized risk? Well, I think that fact relates to the ongoing risk. That does show the particularized risk, and this is actually the argument that I'm trying to make, which is if he goes back to prison—let me take a step back. You were addressing the first time he was incarcerated, and the IJ is right that he was moved in the first instance. What the IJ did not consider, and the testimony supports, is in the second prison he was protected by somebody there. He said a detainee. That's the part I'm not quite clear of. But that when that person who was protecting him was going to leave, he was told that he was going to get transferred back and susceptible to murder again. So he was no longer protected. He was only protected in that one second prison while that person was there, and that person's not there. And that's what precipitated the escape. The escape was to protect himself, and the idea— You would agree that government officials assisted in the escape, wouldn't you? There was a guard. Huh? There was a guard who was paid off by— It seems like at least two, maybe three times when he's at risk, the government takes some action to protect him. Yes, there are individuals that have taken action to protect him, and this kind of goes to the government's argument generally that the federal Mexican government is trying to fight the cartel violence. But— Is your argument that the government will be unable to protect him or unwilling to protect him, or both? It's both in a certain extent. Can you show me where you made the argument that the government might be unable to protect him? That the government would be unable to protect him? Uh-huh. So the— Yes. The record includes not only his testimony, but includes country condition evidence, such as a Washington Post argument that talks about Mexico Jalisco's new generation cartel blazes a bloody trail and rise to power, and that's at the record 7-11, describing it as the most powerful drug cartel. One of the quotes in that describes the president's decision not to launch a military offensive to curb the cartel's influence, described the authority's weakness in stopping them, and when they decided to release a cartel member's son in the face of an assault instead of defend against it. It describes the lack of a coherent strategy against the Jalisco cartel and the hampering of anti-drug operations. There's other articles, including an American conservative article at the record 7-1-8, and, quote, Mexico is now on a trajectory to become a vast gangland governed more by warlordism than by the state. I guess the issue then is, you know, how is this particularized to your client, and under the standard of review, how does this evidence compel the conclusion that the BIA got it wrong? The threat is, the particularized threat is not the general rise to power of the Jalisco cartel. It's the fact that the boss of the Jalisco cartel said, if you come back to Mexico or you come back to Zamora, we will kill you. That is a particularized threat, in our opinion. The other thing about the Barbosa family, that is also a particularized threat, because it's not the general cartel's violence and it's not about general violence against police officers. It's about that if he goes back to prison, he is trapped by the cartel and in a place where the cartel can use their government influence to reach him and murder him. Those are the two particularized threats that are specifically against him. Is your client still detained? Yes. He has sought bail and has been rejected several times, and we've talked about that, but he is still detained. And the concern is that the cartels, the individuals, not the general cartel, the individuals in the cartel who know him, who know of his experience, and know that he knows generally about the cartels, will, if he is sent back, find him in prison and kill him, or if he goes back and is found out and about, they will kill him. Unless he, I guess there's an escape clause that if he joins the cartel and starts assassinating public officials, then he won't be killed, but I'm not even sure that is still the case. So this isn't torture by the government. You have to show consent or acquiescence by the government. Right. Right? Have you argued that the government would consent or acquiesce, the government would be willing or unable? Can you be really specific about what exactly your argument is here? Sure. The argument, the acquiescence argument, is mostly on our reply brief in response to the government's argument, but it is twofold. One, the state officials were involved in his incarceration, and they will be either unable or turn a blind eye to the assassination attempt in prison. The second is that the Jalisco New Generation cartel is in charge of 17, 22 states. It's growing every day. They're part of corruption in these governments, and that if he goes back and is found either by a state official or by members of the cartel individually, they will find him and kill him. If it pleases the court, I'll reserve the rest of my time for rebuttal. You bet. We'll hear from government's counsel, please. Good morning. May it please the court? This is Dana Camilleri for the Attorney General. In this case, Petitioner has failed to establish the likelihood of future torture by state actors upon his return to Mexico. The last state action against him occurred in 2010, after which he was apparently imprisoned for approximately two years under his false identity. He had no threats while he was in prison during that time. He was released and returned to his parents' house, where he then became involved in a defense group against the Knights Templar and continued this 10 years of living in Mexico without incident. Forgive me, but we have case law on this point, right? He was living under an alias, and he was moving around constantly. Is it your position that he's required to live under an alias? Your Honor, no, but he wasn't really living under – I guess he was living under an alias, but he was living with his parents. El Chiquis is a childhood friend who is perfectly aware of his identity. He was – actually, after he left the cartel this last time, he went back to see his daughter in a parade. He was fingerprinted, apparently, when he was arrested in 2010, and I guess this alias is so robust that he wasn't identified as a fugitive, which would kind of lessen the idea that he would wind up being imprisoned for this murder so many years later. You make a distinction. He was using an alias, but he was not hiding. He was openly engaged. Correct. That's our position, Your Honor. Your friend on the other side argues that the IJ didn't sufficiently consider the risk of torture by the cartel in particular. That was kind of his first point of error. How do you respond to that? First off, the cartels are not state actors. He hasn't demonstrated that. We also – our position is that there really isn't an acquiescence finding here. It would have to go back down to the board to do that second step in the analysis. This was about likelihood of future torture. However, I respond to that with how the agency assessed the evidence, which was a little bit cherry-picked by opposing counsel in that his friend protected him, intervened on his behalf when he found out that he was being harmed by the cartel, had him assemble the guns, sent him home, to which he promptly went back to his hometown and visited his daughter, so not in hiding whatsoever, and kept offering him jobs to come back and work for him, which really undercuts this idea that he's in danger. And I believe he stayed for another year, and nothing happened before he came to the United States. He was not harmed in any way. Counsel, maybe you could engage with my problem on the front end. Again, I'm just one of three, but it strikes me that the front end of his story about the barroom fight, the shooting, the conviction, given the declarations, his position is that the 18-year sentence was a – his conviction was a shock, given that there were so many witnesses to the crime, and he attributes all of that to the Barbosa's family's ability to influence in a corrupt system. And what I said earlier is by my read, this looks like an unusual – an unusually well-corroborated story on the front end of his story. Do you read that differently? Well, I think even his own testimony was that he had attorneys, that he had them mount a self-defense claim. There is some things that are very clear, I think, as the IJ went forth, but there are also some evidence that – some parts of his story that are not fully corroborated. But even assuming he's credible, he was transferred between prisons, he was protected, and then the superintendent of the prison helped him escape. So it's very unclear how – you know, the Barbosa's have not harmed him. They have not gotten to him. He's been in prison twice now. There seems to be no – there's not sufficient evidence to find the likelihood of future torture based on that. It's very speculative. Because – why is it so speculative? Because they never harmed him. He was in prison for two years. That goes back to my first point. They never harmed him. And yet we have case law on that, right? He's living under an alias and he was moving around. That's why I'm trying to figure out whether your attack is really on the front end or the back end of the sequence here. Right. But I think actually even – he didn't start using an alias until one or two years after he had escaped from prison. And as I said, I think characterizing it as him being in hiding is maybe not what his testimony indicates. What do you think your strongest argument is? Well, Your Honor, I mean the standard of review. There's nothing here that compels a different result. Opposing counsel is conflating the government actors with the cartels and making an argument about acquiescence, but acquiescence is not in this decision. And in terms of the likelihood of future torture, the last state action occurred in 2010. And he did not leave until I believe 2020 or 2021. And he had no further incidents with any of the government officials. I don't have any further questions. Do you, Judge? I do not. Thank you for your argument, counsel. Thank you very much. You bet. From opposing counsel, please. Thank you. The government said acquiescence is not in the decision, and that's one of the main problems here. I would – before I leave, I'd like to direct my attention to the discussion in Joachim V. Bar, which is a case we cite in which the circuit discusses several cases about how Mexican public officials can show acquiescence even while the government is fighting crime. And so it's not that every single public official has to be on the same page. When you have lower-level public officials who are corruptible and who acquiesce to the cartels, then that can constitute acquiescence. And what our argument, at least with the prison, reflects is that in the prison, whether it was the judge or the prosecutor or the prison, Mr. Serrano Estrada is not safe because the government either cannot or will stand idly by while the cartel sends hitmen in. There's also indication in the record in Mr. Serrano's statement at 377. It's just to the contrary of what you just said, isn't it? I'm sorry? You say that the government will stand idly by while he is harmed by the Barbosa family, but the evidence is to the contrary, isn't it? I don't agree with that. There is evidence that there are some public officials who will protect him, and there's evidence that others will not. And the problem here is that if he—it seems like there were one or two public officials that have stepped in to protect him, but— It seems like the evidence to me, and you can disabuse me of this view, but it's more likely that they will protect him because there are incidents that show that they would. Well, there are also—the issue here is there are also incidents that say they wouldn't. What shows they wouldn't? That the fact that the relative of the Barbosas, Benito, came into the prison and was, I believe, transferred to the second prison next to him to make friends with him in order to assassinate him. And then they had an altercation, and then Jose Maria, I think, is his name, right? Is that his name? He was transferred out. He was moved out. And then there's Benito at 385, 389. The reason he escaped was that he was going to get re-transferred back to the place that he was suffering these threats. So the fact that he was—there was an intervention for a short time that protected him doesn't show that there's not acquiescence of government state officials because all you need is one or two prison guards who are corrupted by the cartel to allow this to happen. And the cartel has been searching for him. The Barbosa family has been searching for him. Would that constitute acquiescence by the government? If the state officials stand idly by and allow the cartels to infiltrate the prison to assassinate him, I believe it does. Before you sit down, I couldn't tell from the record, if he is removed, is he going to be returned directly to Mexican authorities? Do you know? That I don't know. I think that I.J. assumed that. He said it was likely in his decision, and I don't have any reason to disagree with that. So when you're looking at the likelihood of torture, when you're considering all of the facts, that includes the fact that he will likely get sent back into a prison where he is susceptible to everything we've been talking about today. Because the status, his official status is escapee, right? Currently, yes. Okay. Is there anything further? No, no. Thank you very much. Thank you both for your arguments. We're going to take that case under advisement.
judges: CHRISTEN, BRESS, Antoon